ARGENBRIGHT, Respondent, *v.* ARGENBRIGHT, Appellant.

(No. 8,027.)

(Submitted February 28, 1940. Decided March 27, 1940.)

[101 Pac. (2d) 62.]

*Mr. J. D. Fitzstephens,* for Appellant, submitted a brief and argued the cause orally.

*Messrs. Louis P. Donovan* and *Patrick L. Donovan,* for Respondent, submitted a brief and argued the cause orally.

MR. JUSTICE ARNOLD delivered the opinion of the court.

The plaintiff brought action against her husband, the defendant, for divorce, alleging, among other things, that the defendant for more than one year immediately preceding the commencement of the action had treated the plaintiff with extreme cruelty and had inflicted grievous mental suffering on the plaintiff by a course of conduct set out in section 5738, Revised Codes of 1935, using the language of the statute in her allegation. After a trial without a jury, the court made general findings to the effect that all the allegations of the complaint were true, and that the plaintiff was without means to support herself and minor son, of the age of four years, and that $50 per month was reasonable and necessary for permanent support of plaintiff and her son. Judgment was entered accordingly, granting her a divorce and custody of the child with $50 per month as permanent support. The defendant was an oil field laborer earning about $145 per month.

The sole question for us to determine is whether or not the evidence sustains the decree. It appears that when the plaintiff married she was 18 years of age and the defendant approximately 38 years of age. The plaintiff testified that he was uncompanionable and morose, unhappy and jealous; that he would not take her to social gatherings and accused her of improper relations with others. The evidence indicates that the plaintiff frequently in the absence of her husband went to dances, roller skating parties and other social events, and at times left her young child in the custody of others while she was out seeking

social companionship. In the evenings she would spend much of her time downtown. The defendant rarely accompanied plaintiff to social gatherings, claiming he could not afford it.

The evidence in support of an allegation that the defendant threatened to kill the minor son of plaintiff was as follows:

"Q. You said you were going out riding on Sunday afternoon with Claude Deere and Effie Deere? A. Yes. As I gathered Eddie up in my arms Frank rushed to the dresser drawer and pulled out a 32 revolver gun and said, 'No, you don't go, or I will go out there and kill them.' Well, I opened the curtain and motioned them on. I didn't question him. I didn't want anything to happen."

The defendant denied this alleged happening in toto. There was nothing to corroborate plaintiff concerning this, and besides plaintiff continued to live with defendant for more than a year thereafter.

Likewise the charge that defendant accused plaintiff of improper relations is virtually unsupported, the only evidence we find in the record being as follows: From testimony of plaintiff's sister, Effie Deere:

"Q. Will you tell the Court who went to the Park and what time it was? A. It was May the 30th, is when Sam Simpson, myself, my husband and sister went along.

"Q. Was there any argument or fight between the plaintiff and defendant after you returned from Glacier Park? A. Yes, there was.

"Q. Will you tell the Court what that argument was about? A. He accused her of adulterations with Sam.

"Q. You mean adultery, do you not? A. Yes, sir."

From plaintiff's testimony:

"Q. Did he accuse you of having improper relations with anybody on that trip? A. He could not say he would be along. He did not know. * * *

"Q. And did he also continually accuse you of having— A. Yes, he did.

"Q. Of having relations with anybody else? A. Yes, sir."

On the other hand, the defendant testified that the charge of

improper relations, if it could by any interpretation be such, was in the following words:

"Q. You have heard the testimony of the plaintiff, as well as various witnesses to the effect that you had accused her of improper relations with other men. Is that true? A. No, sir, I have never accused her.

"Q. Will you state to the Court the nature of the conversation had upon her return from Glacier Park on the occasion when Sam Simpson was present? A. I told her if she kept running around with Sam Simpson that she was going to lower her name, and that if she insisted upon going with an Indian, why, she knew what she could do. I said, she was not making a home for me."

There is evidence that plaintiff's sisters advised her on several occasions to leave the defendant and that she would probably be happier with a younger man.

The effect upon plaintiff of the alleged extreme cruelty was given to the court in the following words:

"Q. Tell the court whether or not it is possible for you to continue to live with the defendant. A. It was not.

"Q. And is it now in your opinion possible? A. No, sir, it is not."

As was said in the Montana case of *Williams* v. *Williams,* 85 Mont. 446, 278 Pac. 1009, 1010: "Each case must be determined upon its own peculiar facts, and it is well recognized by the authorities that an inclusive and exclusive definition of legal cruelty cannot be given. The courts have not attempted so to do, but generally are content with a determination as to whether the facts in the case considered constitute extreme cruelty. Whether the defending spouse has been guilty of extreme cruelty as defined by the statute is purely a question of fact to be determined from all the testimony presented. The particular acts of cruelty of which complaint is made are not in themselves determining factors, but the question is whether the acts of cruelty are of such a nature and character as to destroy the peace of mind and happiness of the injured party." (*Putnam* v. *Putnam,* 86 Mont. 135, 282 Pac. 855; *Bickford* v. *Bick-*

■ *ford,* 94 Mont. 314, 22 Pac. (2d) 306.) In the last cited case we recognized the rule that, when the evidence fully considered furnishes reasonable grounds for different conclusions, the findings will not be disturbed.

In 19 Corpus Juris, page 50, we find the following: "And the fact that a wife is moody, whimsical, exacting, irascible and inconsiderate of her husband, failing to take an interest in his affairs or enter into the social life which he desires does not entitle the husband to a divorce on the ground of cruelty. The general rule is that conduct causing mental pain to constitute cruelty must be such as to produce impairment of health or create reasonable apprehension of that result. Hence, as a rule, treatment causing mere unhappiness, accompanied by no ill effects on the health, actual or threatened, is not such cruelty as to authorize a divorce. Where, however, the conduct of a spouse is calculated permanently to destroy the peace of mind and happiness of the other so as utterly to destroy the objects of matrimony, a divorce may be granted on the ground of cruelty; and in those jurisdictions where extreme cruelty as defined by the statute includes the infliction of grievous mental suffering as well as bodily injury, it is not necessary that such suffering produce impairment of health."

While our statute provides that such acts as fall within the definition of extreme cruelty are grounds for divorce if they are justly and reasonably of such a nature and character as so to destroy the peace of mind and happiness of the injured party, or entirely to defeat the purpose and legitimate objects of marriage, or to render the continuance of the married relation between the parties perpetually unreasonable or intolerable to ■ the injured party, nevertheless the burden is on the plaintiff to show that the effect of such acts creates the condition which the statute condemns, which we believe she has failed to do in this case. The evidence, weak as it is, shows little more than incompatibility, which is not a ground for divorce in Montana in the absence of a showing of the result specified in the statute.

It is clear that the disparity in ages of the parties, interference on the part of relatives, the desire for emotional outlet on the part of the plaintiff at social gatherings which people of her age like to attend, and the lack of desire on the part of the defendant to attend them, were the chief causes for the marital disturbances outlined in the complaint. The failure of plaintiff to subordinate juvenile emotions to her responsibilities as a mother and wife, and the refusal of the defendant to yield in some degree to her idea of social diversions were also contributing factors.

Before severing marital bonds, awarding alimony and depriving a father of his son, and a son of his father, the evidence should be clear and convincing that his actions result in what the statute condemns, as we have mentioned above. We believe the decree is not supported by substantial evidence.

The judgment is reversed with direction to the trial court in its discretion either to dismiss the complaint or retain jurisdiction for such further proceedings as it deems proper not inconsistent with this opinion.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES MORRIS and ERICKSON concur.

MR. JUSTICE ANGSTMAN:

I dissent. While the testimony does not make out a strong case, I think there was sufficient to sustain the findings of the trial court. There is evidence by plaintiff set out in the majority opinion which, though contradicted by defendant, tends to show defendant continually accused plaintiff of having improper relations with others and that this conduct rendered the continuance of the marriage relation impossible and intolerable and tended to defeat the legitimate objects of marriage within the meaning of section 5738, Revised Codes. While the testimony was in the nature of conclusions, I think it sufficient to sustain the ultimate fact in question so as to make a fact issue for the court. This being so, we should not disturb the findings and decree

since the trial court was in a better position than are we to pass upon conflicting evidence.

Rehearing denied April 17, 1940.