DETERT, APPELLANT, *v.* DETERT, RESPONDENT.

(No. 8412.)

(Submitted June 10, 1943. Decided October 22, 1943.)

[142 Pac. (2d) 215.]

314

*Mr. Wallace* argued the cause orally.

*Messrs. Walchli & Korn,* for Respondent, *Mr. Hans Walchli* argued the cause orally.

MR. JUSTICE ERICKSON delivered the opinion of the court.

Otto F. Detert and Mary F. Detert were married on the 18th day of February, 1939, at St. Ignatius, Montana. Both of them had been married before. At the time of their marriage the husband was some sixty years of age, and Mary F. Detert was about forty years old. Each of them had children by their prior

marriages. At the time of their marriage, Mrs. Detert was operating a restaurant in the town of St. Ignatius. The husband, the plaintiff in the action below, owned a farm in Lake county, another farm in Minnesota and other property. After their marriage a house and lots were acquired in the town of St. Ignatius. On April 1, 1939, the plaintiff in the office of the late John P. Swee, then a practicing attorney in Lake county, executed deeds to his Montana property in which the defendant was named as the grantee. These deeds he handed to the defendant and later they were placed in a safety deposit box by the plaintiff and the defendant in the bank at Ronan. Some time later the parties to this action went to the bank at Ronan and took the deeds from the safety deposit box and took them to their home. On November 2, 1940, these deeds were recorded in the office of the Clerk and Recorder for Lake county. Some time in June of 1941 the defendant left the state of Montana on a trip and from that time on, for all practical purposes, the parties ceased to live together. On the 21st day of June, 1941, the plaintiff brought an action in equity to set aside the deeds above mentioned on the ground that they were fraudulently obtained and it was not his intention that they be recorded until after he was dead. The trial was had in the district court for Lake county and judgment was entered for the plaintiff. The record of that trial was presented as evidence in this action and it was admitted together with the findings of the court and its judgment. In that trial the plaintiff testified that he deeded his Lake county property to the defendant as set out above, but that it was not his intention at the time he made the deeds that they be effective until after his death. He testified that he did not discover that the deeds had been recorded by the defendant until she had left on the trip above referred to. The defendant and her witnesses, including the attorney who drew the deeds which plaintiff sought to set aside, testified that plaintiff voluntarily made and executed the deeds and delivered them to the defendant in the witness' office. The testimony of an attache of the Clerk and Recorder's office of Lake county strongly indicated that plaintiff was present with the defendant

when she had the deeds placed of record. There is uncontroverted testimony on the part of representatives of two fire insurance companies that between the recording of the deeds in November, 1940, and his asserted first knowledge thereof in June, 1941, plaintiff transferred to defendant the fire insurance policies on the premises covered by the deeds, in one instance presenting the assignment personally and stating to the agent that he had deeded the property to defendant. The trial court, however, found generally in favor of the plaintiff and entered judgment setting aside the deeds. While the action to set aside the deeds was pending plaintiff filed this action for divorce and set out the securing of the deeds by the defendant as mental cruelty under the statute and claiming such cruelty as ground for divorce. To this complaint defendant filed an answer and cross-complaint. The trial court in the first action took cognizance of this action which was then pending for divorce, saying in No. 9 of the findings of the court, "that any equities the defendant may have to the plaintiff's property which he owned at marriage or acquired during their short marital relations as also her dower right in the real property, this can be more appropriately considered and adjusted in the divorce action now pending between them than in this action." After trial was had in this action judgment was entered denying the plaintiff any relief and awarding to the defendant on her cross-complaint a decree of divorce and a money judgment in lieu of alimony and other relief in the sum of $4,000 and attorneys' fees. The judgment in this cause provided, however, "that the defendant shall execute and deliver to the plaintiff good and sufficient deeds of conveyance [of the property involved in the equity suit] as ordered and directed in that certain judgment entered in equity action No. 2487 in the above entitled court between said parties and that the defendant shall thereby deem said judgment rendered in said equity action as final and shall abandon her proposed appeal from said judgment. * * * '' From this judgment plaintiff appealed and defendant has filed cross-specifications of error, appealing only from the amount of the money judgment.

The questions presented by this appeal are: Does the answer and cross-complaint state a cause of action for divorce? Is the evidence sufficient to sustain the judgment, if the first question is answered in the affirmative; and was the money judgment excessive?

Before discussing the three propositions above set out it may ▮ be well to dispose of plaintiff's contention that the court erred in not granting him the judgment for divorce. His chief argument is that defendant's actions in securing the deeds above referred to and of putting them on record constituted mental cruelty and further that the findings and judgment of the trial court in the first case are in effect *res adjudicata* and that the trial court in the divorce action was bound by them. While there can be no doubt that the judgment of the trial court in the equity action is *res adjudicata* as to the matters in issue there, that action did not purport to, nor could it, determine the issues in this action which is one for divorce. That action and the plaintiff's own testimony do reveal affirmatively and without question that the plaintiff claims the first knowledge he had that the deeds had been put on record was some time in June of 1941. This action was filed by plaintiff on January 7, 1942. Section 5738, Revised Codes, provides that to constitute cause for divorce, mental cruelty must exist for one year prior to the commencement of the action. The findings of the trial court in the first action are to the effect that prior to this date the parties got along very well together and that the plaintiff had every confidence in the de- ▮ fendant and reposed great trust in her. The plaintiff's own testimony is to the same effect. According to him, the fact that the defendant had placed these deeds on record in November of 1940 was not brought home to the plaintiff until June of 1941. It can hardly be thought that the defendant's action of November 2, 1940, in recording the deeds which did not come to plaintiff's knowledge until June of 1941, immediately started the course of mental cruelty and suffering contemplated by the statute. (See *Robinson* v. *Robinson,* 66 N. H. 600, 23 Atl. 362, 15 L. R. A. 121, 49 Am. St. Rep. 632; *MacDonald* v. *MacDonald,* 165 Cal. 665,

668, 102 Pac. 927, 25 L. R. A. (n. s.), 45; *Barnes* v. *Barnes,* 95 Cal. 171, 30 Pac. 298, 16 L. R. A. 660.) It cannot be said that the evidence on the part of the plaintiff establishes mental cruelty within the requirement set up in this court in *Argenbright* v. *Argenbright,* 110 Mont. 379, 101 Pac. (2d) 62, and it is clear that plaintiff is not entitled to a divorce.

The cross-complaint alleges cruelty on the part of plaintiff. This cruelty is specifically set out as follows: That from the beginning of the marriage of the parties and throughout their married life the children of the plaintiff violently and strenuously objected to the marriage between them, and constantly complained to the parties about the marriage and urged and insisted that the plaintiff convey his property to his children by his first marriage; that the children treated the defendant with disrespect and contempt, and that the plaintiff from time to time mentioned to the defendant these complaints and the hostility on the part of the children; that this treatment by the children caused her great mental pain and suffering and caused her to be in a high state of nervousness and nervous collapse; that the plaintiff acquiesced in the conduct of the children and permitted them to continue this conduct; that because of this conduct it was impossible for the plaintiff and defendant to continue to reside together as husband and wife in the community; that the plaintiff agreed to remove from the community but that he failed to do so even though preparations were made for moving. The second specific allegation of cruelty was that plaintiff had accused the defendant of being a dope fiend and engaged in the illegal sale of narcotics. It has been suggested that these accusations by the husband to the defendant alone and in the presence of others cannot be mental cruelty in view of this language from section 5738, Revised Codes, i. e., "the repeated publication or utterance of false charges against the chastity of the wife by the husband, * * *" is extreme cruelty. It is difficult to take such a suggestion seriously in view of the next portion of the same sentence from which the above quotation is taken, which defines extreme cruelty as "the infliction of grievous mental suffering

upon the other by one party to the marriage, by a course of conduct towards or treatment of one party to the marriage by the other, existing and persisted in for a period of one (1) year before the commencement of the action for divorce, which justly and reasonably is of such a nature and character as so to destroy the peace of mind and happiness of the injured party * * *.''
No case is cited in support of this novel suggestion and we have found none. (See *Argenbright* v. *Argenbright,* supra, and the many cases therein cited.) Clearly, the cross-complaint sufficiently charges mental cruelty so as to state a cause of action.

It is urged by appellant that the action of plaintiff's children may not be charged to him so as to make him guilty of cruelty. His contention is that the ordinary rule, as stated in 27 C. J. S., Divorce, section 25, p. 549, which makes the husband chargeable for the misconduct of his children toward his wife, is not applicable where, as here, the children have reached their majority. In this case we do not need to determine the abstract question whether, under the circumstances, the conduct of plaintiff's children alone is sufficient to constitute cruelty on his part. The facts here are that there was much more than the hostile attitude and acts of the children toward defendant. While defendant had some knowledge of this conduct on the part of the children, the main information she had as to it was conveyed to her by the husband. He constantly reminded her of his children's behavior. The testimony shows that on a great many occasions he told the defendant about the objections of most of his children to the marriage, of their fear that she would get all of plaintiff's property, of their attempts to get the property deeded to them, of their general attitude toward the defendant, of their statements to third persons, of their threats against her person, and of various other things which they were supposed to have said and done to indicate their dislike of the defendant personally and of their disapproval of the marriage.

Defendant's testimony is that these reports on the part of the plaintiff resulted in her nervous collapse and physical illness, and the testimony of others substantiates her testimony to this

effect. The reports of his children's activities and statements could serve but one purpose, and that to drive home to her their attitude and thus destroy her peace of mind and happiness and make the continuance of their marriage relationship impossible. The record is entirely barren of any attempt on the part of plaintiff to do anything to alleviate the situation. The record does show that he agreed that it would be better to remove from the immediate vicinity of the children and took steps in co-operation with the defendant to move to some other locality, but at the last minute changed his mind. For cases similar in some respects to the one in question, see *Day* v. *Day,* 84 Iowa 221, 50 N. W. 979; *Thompson* v. *Thompson,* 205 Mich. 124, 171 N. W. 347, 3 A. L. R. 990; *Hall* v. *Hall,* 9 Or. 452. In addition to what is said above, the cross-complaint alleged that plaintiff had accused the defendant of being a dope fiend. Defendant testified that plaintiff had accused her of using dope on several occasions, and one other disinterested witness testified that she overheard the plaintiff call the defendant a "dope head."

We think the evidence is sufficient to sustain the trial court ▮ as to the divorce.

Both parties questioned the money judgment entered, plaintiff taking the view that it is excessive, and the defendant that it is insufficient. It would seem that both parties, in view of their subsequent action, are precluded from raising the question. As has been indicated above, plaintiff placed great reliance on the findings of the trial court in the first equity action involving the property as concluding the defendant, since she took no appeal from that judgment. But by the terms of the judgment in this case, the defendant was required, as a condition to her receiving the $4,000 award, to accept as final the judgment in the first case, to abandon her appeal therein, and to execute to the plaintiff the deeds required of her by that judgment. This she did, and on the argument it was admitted that plaintiff had accepted these deeds and placed them on record. Without considering the propriety of this provision the facts are indisputable that as a practical matter, in order to obtain the benefit of the alimony

provision, defendant did abandon her appeal in the prior action and did execute the deeds, and that the plaintiff accepted them and put them on record with full knowledge of all the circumstances. If now the decree in this case is reversed, either on the grounds that the alimony is excessive or improper, or upon the determining factor that defendant was not entitled to a divorce, defendant will take nothing under either suit, having abandoned her rights in the first in reliance upon the judgment in the second, with plaintiff's acceptance of her action. Under the circumstances it would seem very questionable whether either has any standing here on appeal in an equity case, although we do not rest our decision upon that point.

Even though the parties had not precluded themselves from raising this question of the amount of the award, it seems clear that the trial court did not abuse its discretion in entering the ▪ judgment it did. Included in plaintiff's assets of $25,600 was a note from his son for $12,000. This note represented the balance of the purchase price the son agreed to pay for the Minnesota farm. The findings of the trial court indicate that the district judge thought this note of little or no value. It is the defendant's view that had the trial court figured this note at its face value, the judgment for the defendant would have been considerably higher, and that there was nothing in the evidence to warrant the district judge in assuming that the note could not be collected at its face value. The findings and the record do not show that had the note been considered at its face value the judgment of the district court would have been for any amount greater than the $4,000 awarded. The amount of an award in lieu of alimony in a divorce action is peculiarly within the discretion of the trial judge, and there is no fixed rule to guide the trial court in the exercise of that discretion. (*Nuhn* v. *Nuhn,* 97 Mont. 596, 37 Pac. (2d) 571; *Cummins* v. *Cummins,* 59 Mont. 225, 195 Pac. 1031.)

The property of the husband, in the main, was acquired prior to the marriage. The parties did buy the Ronan property after their marriage, and while the point is disputed, there is evidence

that the defendant contributed to the purchase price thereof. She further testified that she worked out as a practical nurse, and otherwise, during the course of their marriage and that whatever she earned was contributed to the family finances. Under the circumstances we cannot say that the trial court abused its discretion in awarding to the defendant in lieu of dower the sum of $4,000.

The judgment is affirmed.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES ANDERSON and MORRIS concur.

MR. JUSTICE ADAIR dissenting:

It is my judgment that under our statutes (1) the cross-complaint of the defendant wife fails to state sufficient facts to constitute a cause of action for divorce, and (2) that the evidence introduced is wholly insufficient to sustain a decree and lump sum awarded in her favor.

A few additional facts from the record may prove helpful here. The defendant Mary Detert formerly lived in Oklahoma from whence she came to Montana in 1937. She acquired and operated a small cafe in St. Ignatius where she met the plaintiff Otto Detert. After an acquaintance of a couple of weeks they were married. She was a divorced woman. Twice had she been married before. By one of her former marriages she had three children ranging in ages from 15 to 21 years.

The plaintiff Otto Detert was a widower. His first wife died in 1935. By her he had one daughter and five sons, all of whom had attained their majority and most of whom were married when he wedded Mary.

At the time of the marriage Mary had no property other than her interest in the cafe, which interest she sold immediately after the wedding, for $800.

Otto, on the other hand, owned considerable property, including a farm in Minnesota valued at $13,000, a farm in Lake county, Montana, valued at $12,000, and a large amount of personal property all acquired during the lifetime of his first wife.

Three weeks after the marriage Otto purchased two houses and three lots in St. Ignatius, at which time Mary insisted that title thereto be taken in her name but to this suggested arrangement Otto would not then assent.

About six weeks after the marriage, Otto, accompanied by Mary, went to Ronan, where he signed and acknowledged deeds of conveyance to Mary of all his real estate in Montana, including his Lake county farm and his two houses in St. Ignatius. He also executed a deed to his Minnesota farm, naming therein his daughter and five sons, as grantees. The deeds were not delivered nor were they to be delivered until after Otto's death, but they were placed in an envelope on which was written, at the request of plaintiff and defendant, the specific direction that upon the death of Otto, then were the deeds to be delivered. A safety deposit box was rented at the Ronan bank and in it the deeds were deposited. To this safety deposit box at the bank each party had a key and access. Thereafter, at the instance of Mary, these deeds and other papers were taken from the safety deposit box at the bank and placed in a tin box kept at the home of the parties. To this tin box again each party had both key and access.

Some time later, Mary prevailed upon Otto to convert all his personal property into cash preparatory to moving away and establishing a home elsewhere. A public sale was held on March 6, 1941, at which plaintiff's farm machinery and livestock were sold. Thereafter, and at about 11 o'clock on the morning of June 18, 1941, Mary informed Otto that she intended, on the following day, to leave the state but when Otto returned to his home that afternoon he discovered that during his absence therefrom Mary had started back to her old home in Oklahoma in Otto's brand new Dodge automobile. Before driving away Mary delivered to her daughter and son-in-law, Mr. and Mrs. James Feucht, certain furniture, household goods, cooking utensils, bedding and personal effects belonging to Otto, leaving them a signed written memorandum to the effect that she had been paid for the articles so delivered. Mary also carried away with her

Otto's valuable papers which she had surreptitiously removed from the tin box at the Detert home where they had been kept.

At this turn of events, Otto immediately and on June 19, 1941, sought the assistance and advice of an attorney. Upon consulting the records at the county court house the attorney found that the deeds to Mary, as grantee, of Otto's Lake county farm and all of his St. Ignatius property had been placed of record. These facts the attorney promptly communicated to plaintiff, which was the first information or knowledge plaintiff had of such recordings.

Thus on June 19, 1941, the day following Mary's departure, did Otto have a most sudden and rude awakening. He then discovered that he had been divested of all his property, real and personal, and ''set afoot'' in a most literal sense. *Gone* were his wife, his Lake county farm, his St. Ignatius houses, his certificates of stock, his mortgage, his promissory note of $12,842, his automobile, his furniture, his household goods, his bedding and even his personal effects and wearing apparel,—everything that he had been able to accumulate in the 61 years that he had lived before Mary came into his life, had vanished.

To recover his property required prompt and efficient action on the part of both Otto and his attorney. The first thing Otto did was to repossess from Mary's son-in-law and daughter, Mr. and Mrs. Feucht, Otto's personal property which Mary had wrongfully delivered to them as she was leaving the state. To recover his real estate Otto, on June 21, 1941, commenced in the district court against Mary the suit in equity, No. 2487, requesting the court to cancel, for fraud, the deeds to Mary of plaintiff's Lake county farm and of his St. Ignatius houses and lots. To recover other personal property of the aggregate value of $15,-976.62 which Mary had wrongfully taken from his possession, including the new Dodge automobile, a Ford truck, a cow, two heifers, two stock certificates, an unpaid promissory note for $12,842 and the mortgage deed securing same, Otto instituted, against Mary, cause of action No. 2505 in said district court.

Eight days after Mary left Otto she wrote him as follows:

"Chickasha, Okla. June 26

"Dear Otto: How are you. I should have written sooner, but have been so tired & worried. The folks are pretty good. Lila is feeling some better. I guess you think I'm terrible, but I am so near crazy anyway, & I just couldn't say good bye to you. Myrtle is with us & we are on our way to Calif. I hope I find work soon as we get there, for I have only a few dollars left. Jim & Lila finished paying me for the furniture & it is gone. What have you been doing. Has Mr. Turnedge got the cabinet finished. How does it look. Does Doris have it papered yet. When I get to Cal. I'll write you again & if I find work & you want to come out alright & if you don't, you can write to me and I'll send you your papers. They were in with mine. I'll close & write again. Bye. Mary"

Following the filing in the district court of the above suits against Mary, her daughter Lila and the latter's husband James Feucht, instituted, against Otto, cause of action No. 2529, for the recovery of the personal property which Mary had turned over to them and which Otto had repossessed, demanding, against Otto, in lieu of such recovery, judgment for $485.45 actual and $500 exemplary damages.

Equity suit No. 2487 to cancel the deeds to Mary for her fraud upon Otto was, on the 3rd and 4th days of February, 1942, tried to the court without a jury and thereafter the court made its findings of fact and conclusions of law for the plaintiff Otto and against the defendant Mary and judgment in accordance therewith was entered March 10, 1942. No exceptions or objections were made to any of the findings of fact or conclusions of law and no appeal was taken from the decree in said equity suit, which decree has long since become final. It is well settled that by failing to prosecute an appeal the defendant Mary elected to abide the result of the trial in such equity suit. (*Fowlie* v. *Cruse*, 52 Mont. 222, 229, 157 Pac. 958.)

In the present divorce action, No. 2569, Otto filed his complaint January 7, 1942; Mary filed her answer and cross-complaint March 13, 1942; the trial occurred May 19, 1942, and the

decree was filed June 9, 1942, being three months subsequent to the filing of the decree in the equity suit No. 2487.

*Complaint.* The plaintiff brought his suit for divorce on the grounds of extreme cruelty occasioned by a course of conduct by defendant toward and treatment of plaintiff existing and persisted in for a period of more than one year preceding the commencement of the action consisting, in part, in that "the defendant almost immediately following their said marriage, secretly began to contrive and devise a plan or scheme to cheat and defraud the plaintiff out of all his property and to gain possession and control thereof." The complaint also charges that in carrying out said scheme, defendant made repeated requests and solicitations to plaintiff to transfer his property to her; that defendant fraudulently took and recorded two undelivered deeds by means of which she acquired legal title to plaintiff's farm in Lake county, Montana, and to his two houses and three lots in St. Ignatius, Montana, thereby necessitating the bringing, by plaintiff, of suit in equity No. 2487 against defendant to set aside said deeds and to regain his title; that defendant wrongfully took and converted a large amount of plaintiff's personal property, including a certificate of stock in the Farmers' Union Oil Company, an unpaid promissory note of $12,842, a mortgage securing said note, and a new Dodge automobile valued at $1,200, necessitating the bringing, by plaintiff, of action No. 2505 against defendant in an endeavor to regain possession of such personal property; that defendant wrongfully transferred and disposed of plaintiff's said Dodge car; that she wrongfully delivered plaintiff's household goods, furniture and personal effects to her daughter and son-in-law from whom plaintiff repossessed his chattels, resulting in a lawsuit, No. 2529, by them against plaintiff, which action plaintiff was required to defend; that subsequently the defendant, without cause, abandoned and deserted plaintiff and refused to longer remain at home or to perform her domestic duties and that defendant stated to other persons that she did not marry the plaintiff for love but only for his property, which caused plaintiff great humiliation.

*Answer.* In her answer the defendant admits that she obtained from plaintiff deeds to his Lake county farm of the value of $12,000 and to the St. Ignatius property of the value of $1,500, but alleges that plaintiff freely and voluntarily delivered said deeds to her and that she "now claims and asserts that she is the owner of said properties." She admits that she took into her possession the certificate of stock of Farmers' Union Oil Company, the promissory note of $12,842 and the mortgage given to secure the same "and alleges that said papers and documents were taken by her *through inadvertence*"; and she admits that she transferred and disposed of the new Dodge automobile.

*Cross-complaint.* The allegations of the cross-complaint are substantially as set forth in the majority opinion. Issue was joined by the filing of a reply.

By stipulation of the parties the pleadings, evidence given, findings of fact, conclusions of law and judgment in the equity suit No. 2487 were all introduced in evidence in this divorce action. Among these findings and conclusions were the following:

"I. That on February 18th, 1939, the plaintiff and the defendant were married. The plaintiff was then nearly 61 years of age, and was a widower with six grown children. The defendant was approximately 41 years of age, and a divorced woman having three children ranging in age from 15 to 21 years. From the date of their marriage, the parties hereto lived and cohabited as man and wife until early in June, 1941, when the defendant, without the plaintiff's consent, left his home and went, first to Oklahoma, and then to California, with the intention of permanently residing at the latter place. During the period they lived together they seemed to get along very well, and the most confidential relations existed between them, and the plaintiff did repose the greatest confidence and trust in the defendant, and advised with the defendant in all their business affairs, and believed the defendant would deal fairly and justly with him in all things.

"II. On the date of their marriage the plaintiff was, and for

many years had been, the owner and in possession of a farm in Lake County consisting of 160 acres, described in the complaint, which description is admitted, and the same will hereinafter be designated as the Lake County ranch. The plaintiff then was also the owner of a farm property in Martin County, Minnesota, consisting of 153.8 acres, of the approximate value of $13,000.00, which herein will be designated as the Minnesota Farm. About March 11th, 1939, the plaintiff acquired by purchase certain lots and buildings in the Town of St. Ignatius, Lake County, Montana, also described in the complaint, on which two dwellings were located, and which will be herein designated as the St. Ignatius property.

"III. At the time of the purchase of the St. Ignatius property the defendant seriously urged the plaintiff to put the title to this property in her own name, but this he refused to do, and the deed was to the plaintiff only. Soon thereafter, because of the requests of the defendant and her many-times-expressed wish, the plaintiff agreed to make some sort of arrangement regarding all of this property and agreed with the defendant that, if she continued to live and cohabit with him as his wife, and would continue to be and remain his helpmate throughout his natural life, he would arrange his property in such a way that on his death she would receive a deed to the Lake County ranch and the St. Ignatius property, and that he would make another deed of the Martin County, Minnesota farm to his six children, so that they should also receive this property on his death.

"IV. To carry out the foregoing understanding, on April 1st, 1939, the plaintiff and the defendant went to Ronan, * * * and the plaintiff signed and acknowledged, three warranty deeds, one of the Lake County Ranch property, one of the St. Ignatius lots, * * * and a third deed of the Martin County, Minnesota farm, in which the six children of the plaintiff were named as grantees. * * * After the deeds were completed, the lawyer placed them in an envelope, all three of them, * * * a direction was written on the envelope by an officer of the bank to the effect that the deeds would be delivered to the defendant upon the death of the plain-

tiff. The plaintiff then rented a safety deposit box, paid the rental, and the envelope containing the three deeds and the written directions as above found were placed in such safety deposit lock box, * * *. It was not then the intention of the plaintiff to deliver the deeds to the defendant, nor did he have any such intention to make delivery of such two deeds at any time during his lifetime; and he did not then, nor at any time, make any effective provision for their delivery after his death. Some time thereafter, plaintiff and defendant, for some particular reason, withdrew these deeds and other papers from the safety deposit box in the bank, and put them in a tin box at their home in St. Ignatius. Again, both parties had keys to this box, and the envelope containing the three deeds was so placed in such box. On November 2nd, 1940, unknown to the plaintiff, the defendant took the two deeds, * * * to the Clerk and Recorder's office at the county seat of Lake County, where the same were recorded, and the fees paid by the defendant or by some man with her, who was not the plaintiff. When these deeds were executed, on neither of them was there placed any Federal Internal Revenue stamps; neither was there any such stamp on them when they were recorded, and there were no such stamps on them when offered and received in evidence in this case. To that extent the deeds did not comply with the requirements of the Federal law. The plaintiff did not know of their recording until his lawyer discovered them of record some two days before this action was started.

"V. While each of the two deeds * * * mentions a consideration of Ten Dollars, no amount was paid to the plaintiff, and there was no consideration for these deeds except the trust and confidence the plaintiff reposed in the defendant and the belief that the defendant would deal fairly and justly with him in all things, and his then desire that she should have the property described at his death, only provided she continued to live with him, all as heretofore found. * * *

"IX. That any equities the defendant may have to the plaintiff's property, which he owned at marriage or acquired during their short marital relations, as also her dower rights in the real

property, this can more appropriately be considered and adjusted in the divorce action now pending between them than in this action.

"From the admissions in the pleadings, the stipulations of the parties, the uncontroverted facts, and the foregoing findings, the Court makes the following:

"Conclusions of Law:

"I. That the plaintiff never intended to deliver the deeds to the Ranch and the St. Ignatius properties to the defendant during his lifetime, and made no effective provision for their delivery after his death, and there has been no delivery.

"II. That the title to the Ranch and the St. Ignatius properties is held by the defendant in trust to and for the use and benefit of the plaintiff.

"III. That the plaintiff is entitled to a decree requiring the defendant, within ten days after the signing of the decree, to make, execute and deliver to the plaintiff good and sufficient deeds of conveyance, conveying to the plaintiff all of the Ranch and the St. Ignatius properties; and in default of the execution and delivery of such deed or deeds, that the deeds Plaintiff's Exhibits 1 and 2, and the record thereof, be and they are in all things cancelled and set aside, and this decree shall have the effect and operation at law and in equity of such a conveyance, so as to vest the title to such property in the plaintiff in fee simple, free and clear of any and all estate, right, title, claim or interest of the defendant. * * *"

By its decree the district court determined the issues in the equity suit in favor of the plaintiff Otto and (1) adjudged him to be the owner in fee simple absolute of the Lake county farm and of the St. Ignatius property; (2) adjudged that any title of Mary to said property is held in trust for the plaintiff Otto; and ordered (3): "That defendant, Mary F. Detert, within ten days after the signing of this decree execute, acknowledge and deliver to the plaintiff a grant deed or other sufficient deed conveying to the plaintiff all and every the lots, parcels or tracts of land hereinabove described, and in default of the execution and de-

livery of said deed as aforesaid by the defendant, this decree shall have the effect and operation, at law and in equity, of such conveyance, so as to vest the title of said premises in the said plaintiff in fee simple; that defendant and all persons claiming through or under her (other than the plaintiff) be and they are hereby forever debarred, restrained and enjoined from asserting any right, title or interest in or to any of the above described property or any part thereof, after the said ten-day period hereinabove specified.''

In other words, because of the fraudulent means by which Mary had acquired legal title to Otto's real estate, the district court, after a trial duly had, took from her the advantages she sought to acquire, set aside and cancelled the deeds to her, ordered her to reconvey the property to Otto and ordered that in the event she failed to execute and deliver such deeds to Otto the court's decree shall have the effect and operation of such conveyance so as to vest the title of the property in the plaintfif Otto.

There were orderly courses of procedure open to the defendant Mary if she were dissatisfied with the decree so rendered against her. She could have filed motion for a new trial or she could have taken an appeal from the decree but she did neither. Most certainly the district court was without power to deny to Mary her right to appeal to this court had she so desired. In the decree the district court awarded the defendant Mary a lump sum of $4,000 in lieu of permanent alimony and also additional attorney's fees but made same conditional upon certain void provisions inserted in the decree which the district court had no power to incorporate therein; namely, that the lump sum award and attorney's fees be paid by Otto to Mary provided (1) she execute and deliver to Otto good and sufficient deeds of conveyance to the Lake county farm and to the St. Ignatius property upon payment to her of the sums above mentioned, and (2) provided that Mary shall deem the judgment rendered in the equity action as final, and (3) provided further that Mary shall abandon her proposed appeal from said judgment.

In the first place, by the judgment and decree entered three

months previous in the equity suit, the same district court had already ordered that the defendant Mary F. Detert execute, acknowledge and deliver to Otto on or before March 20, 1943, a grant deed to the Lake county farm and to the St. Ignatius property. This decree was at no time appealed from, altered or modified and still stands as a valid order and judgment of the court. Next, upon Mary's failure to execute, acknowledge and deliver to Otto the deeds by March 20, 1942, the decree in the equity suit provided that such judgment ''shall have the effect and operation, at law and in equity, of such conveyance, so as to vest the title of said premises in said plaintiff in fee simple'' and under such provision Otto became vested with the complete and absolute title to the property on March 21, 1942, without any conveyance or deed from Mary. The court was without power to direct that the defendant Mary should deem the judgment rendered against her in the equity suit as final or that she abandon any contemplated appeal from such judgment. Had Mary felt aggrieved by the judgment in the equity suit and had she perfected an appeal in the manner and within the time prescribed by statute, she most certainly would be entitled to be heard on appeal in this court irrespective of any order to the contrary that could be made by the trial court. Absolute title had vested in Otto to all of the property by virtue of the decree in the equity suit long before June 9, 1942, when the trial court made and entered its decree in the divorce action and for the court to direct that Mary execute and deliver to Otto deeds to the property upon the payment to her of the lump sum award and attorney's fees meant absolutely nothing so far as Otto was concerned and, as above stated, the deeds were of no value whatever in view of the provisions of the decree in the equity suit above referred to.

The district court was certainly without right or power, in its decree, to bargain with Mary for the giving to her of money belonging to Otto in the sum of $4,330 in consideration of her executing and delivering to Otto deeds which had no use or value or for her abandoning any alleged proposed appeal which she might perfect from a judgment in an entirely different law suit

334

and for the deeming by her of a judgment rendered in an entirely different law suit as final. As before stated, these provisions set forth in the divorce decree are meaningless and void. The duty of the district court was plain. It had the right and power under the statute to grant a decree of divorce only upon pleadings which stated a cause of action and only upon competent evidence establishing such cause of action. When, as here, both the pleadings and evidence are insufficient to sustain the decree in favor of the defendant, the district court had no right to make either award or decree in favor of the defendant and certainly it could not sustain an invalid decree by making Otto answerable for the void provisions and conditions incorporated by the trial court in the decree under the doctrines of either waiver or estoppel. Neither the plaintiff nor the defendant are bound by any such void conditions and provisions imposed by the trial court.

A litigant has no right, as against the same adversary, to have a question, either of law or fact, relating to the same cause of action, twice adjudicated, in the same court or another court of like jurisdiction, unless a re-examination of the question has been properly ordered. Furthermore an erroneous ruling is just as conclusive as the correct one, if allowed to become final. (See *In re Smith's Estate,* 60 Mont. 276, 199 Pac. 696, 703; *Dunseth* v. *Butte Elec. R. Co.,* 41 Mont. 14, 108 Pac. 567, 21 Ann. Cas. 1258.) ''The judgment was conclusive as to issues raised by the pleadings, issues actually litigated on the trial, and as to all things adjudged on the face of the judgment or necessarily determined in order to reach the conclusion there announced.'' (*Brennan* v. *Jones,* 101 Mont. 550, 55 Pac. (2d) 697, 700.) In other words, a decree of a court stands as an absolute finality ''not merely as to the conclusions expressed, but as to everything directly or implicitly involved in reaching them.'' (*Lokowich* v. *City of Helena,* 46 Mont. 575, 129 Pac. 1063, 1065; *State ex rel. Silve* v. *District Court,* 105 Mont. 106, 69 Pac. (2d) 972; *Blaser* v. *Clinton Irr. Dist.,* 100 Mont. 459, 53 Pac. (2d) 1141. See, also, section 10558, Rev. Codes.)

As her one and only ground for divorce defendant. charged the plaintiff with extreme cruelty. To be entitled to a decree and a lump sum award her cross-complaint must allege sufficient facts to show such conduct on the part of the plaintiff as amounts to extreme cruelty under our statute and her evidence must show that the plaintiff has been guilty of such conduct as the statute condemns.

Courts have no inherent power to dissolve a marriage and their only power to decree a divorce must come from the statutes. (*Rumping* v. *Rumping,* 36 Mont. 39, 91 Pac. 1057, 12 L. R. A., (n. s.) 1197, *Sell* v. *Sell,* 58 Mont. 329, 193 Pac. 561.)

Section 5736, Revised Codes, as amended by Chapter 65 of the 1937 Session Laws, lists *extreme cruelty* as a cause for divorce and in a following section 5738, Revised Codes, the legislature has defined extreme cruelty and specified the conduct that shall be considered as such.

The cross-complaint alleges that after the plaintiff had consented to sell his personal property ''and move to some remote location in which to live'' he ''continually put off the moving of this defendant and plaintiff to a new location, and listened to his children who advised against such change of residence.'' This conduct, if proven, does not constitute a ground for divorce, for under the statute the husband has the right to select the place of abode. Having an established and reasonable place of abode the husband, under the law, has the right to continue living there and he may choose not ''to move to some remote location in which to live'' without supplying to his wife cause for divorce based upon extreme cruelty to her. ·

Section 5783, Revised Codes, provides: ''The husband is the head of the family. He may choose any reasonable place or mode of living, *and the wife must conform thereto.''* (Emphasis mine.)

The cross-complaint alleges ''that on several occasions the plaintiff has accused this defendant of being a dope-fiend and engaged in the illegal sale of narcotics,'' and it alleges that such accusations were false. Such accusations, if proven, do not constitute grounds for divorce. While the statute characterizes ''the

repeated publication or utterance of false charges against the chastity of the wife by the husband," (sec. 5738, Rev. Codes), as extreme cruelty, yet it specifically mentions no other class of publications or utterances.

Mary was subject to what she termed "sick nervous spells" concerning which, on cross-examination, she testified:

"Q. When you married Otto Detert, you knew you would have these? A. Not very often. I had had a few.

"Q. You did have them while you were living with Mr. Auwen? A. I might have had one or two. * * *

"Q. Did you tell Mr. Detert prior to your marriage, that you had fainting spells? A. I don't know whether I did or did not."

These "spells" which occurred while she was living with her first husband Mary attributed to "heart trouble" while those occurring while she was married to Otto she attributes to worry over the conduct of Otto's children.

There is no evidence whatever to sustain Mary's allegations that she was accused of being "engaged in the illegal sale of narcotics" and no witness testified to any such accusation by her husband or anyone else. As to the allegation that plaintiff accused defendant of being a "dope fiend," the evidence fails to sustain the allegation that *"on several occasions"* Otto made such accusation. The only testimony offered by Mary or appearing in the entire record with respect to "dope" is the testimony of the defendant Mary and of the witnesses Marian Furlong and Mary Ann Feucht.

Mary testified that on June 17, 1941, being the day before she left for Oklahoma, she, Otto and Marian Furlong, drove in a car to Missoula and that during the ride she and Otto talked about going some place else to live. She testified, "I asked him when we were going, and where we were going. He had just about made up his mind we weren't going. Then he called me a 'dope-head' or some kind of a name like that." Marian Furlong, called as a witness for Mary, testified: "On this same trip * * * they were arguing about whether he was going, and whether she was

going and he called her a hophead.'' Another witness for defendant, Mary Ann Feucht, being a sister of Mary's son-in-law, James Feucht, testified that on the day the defendant Mary left for Oklahoma, which would be June 18, 1941, Otto told the witness that Mary ''had left just a couple of hours before. * * * He said that her nervousness was caused from her taking dope. I mean, her nervousness was nothing else. It wasn't really nervous spells but that she had been taking dope.''

At the time the above conversation occurred, Mary had already left Otto, intending never to return, and there is no evidence that the witness, at any time prior to the trial, ever informed Mary of such conversation between the witness and Otto after Mary's departure.

When, a few days after her departure, Mary wrote Otto from Oklahoma saying, ''*I guess you think I'm terrible, but I am so near crazy anyway,* and I just couldn't say good bye to you,'' she evidently then considered her conduct ''terrible'' as likewise did the district court when, in the equity case, it branded her as a cheat and a fraud by deciding the case against her and by depriving her of the fruits of her fraudulent conduct.

I cannot agree that the statute, (sec. 5738, Rev. Codes), provides that to constitute cause for divorce, *mental cruelty* must exist for one year before the commencement of the action. It is the *''course of conduct''* of the guilty spouse, or, the *''treatment of one party to the marriage''* by the guilty spouse ''existing and persisted in'' by the guilty spouse ''for a period of one (1) year before the commencement of the action for divorce'' that constitutes the extreme cruelty recognized by the statute as a cause for divorce. It is the course of *wrongful conduct* indulged in by the offending spouse that the statute requires to exist and to be persisted in for a period of one year to constitute cause for divorce. If such wrongful conduct so existing and persisted in justly and reasonably is of such a nature and character as (1) to destroy the peace of mind and happiness of the injured party, or (2) to entirely defeat the proper and legitimate objects of marriage, or (3) to render the continuance of the married rela-

tion between the parties perpetually unreasonable or intolerable *to the injured party*, then such *course of conduct* becomes extreme cruelty under the statute for such conduct and such treatment, under the law, constitute "the infliction of grievous mental suffering upon the other by one party to the marriage."

Mary's conduct is of the "nature and character" condemned. Such course of conduct existed and it was persisted in for considerably over two years. The wrongful course of conduct began immediately prior to April 1, 1939, when Mary prevailed upon Otto to execute the deeds to her. The wrongful conduct was persisted in at the time Mary wrongfully recorded the deeds in November, 1940. It was persisted in when on June 18, 1941, Mary left Otto and wrongfully took and carried away with her personal property of Otto's valued at more than $15,000. It was persisted in when Mary filed her answer on September 26, 1941, in the equity suit wherein she falsely alleged that Otto had voluntarily, absolutely and unqualifiedly delivered the deeds to her on April 1, 1939, at Ronan and that ever since said date "she has been and is now the sole and absolute owner of the property described in each of said deeds." Thus for more than two years Mary persisted in her conduct and in carrying out her plan and scheme to cheat and defraud Otto out of all his property and to gain possession and control thereof for herself as charged in plaintiff's complaint. The fact that Mary kept her conduct, plan and scheme secret from Otto until June 18, 1941, does not alter the fact that her wrongful conduct existed and was persisted in by her for more than the statutory period, section 5738, Revised Codes.

It is not the conscious mental suffering of the injured spouse that the statute requires to exist for a year but it is the *wrongful course of conduct* of the offending spouse that must exist and be persisted in for at least a year that constitutes extreme cruelty under the statute and gives rise to the cause of action in the injured spouse.

The cross-complaint alleges that "from the beginning of the marriage * * * the children of the plaintiff * * * urged and in-

sisted that the plaintiff should convey the property to said children so that this defendant would not receive any portion thereof.'' Our statute provides: "A widow shall be endowed of the third part of all lands whereof her husband was seized of an estate of inheritance *at any time during the marriage,* unless the same shall have been relinquished in legal form.'' (Sec. 5813, Rev. Codes.) (Emphasis mine.) Another statute provides: "No act, deed, or conveyance, executed or performed by the husband, without the assent of his wife, evidenced by her acknowledgment thereof, in the manner required by law to pass the estates of married women, and no judgment or decree confessed by or recovered against him, and no laches, default, covin, or crime of the husband, shall prejudice the rights of the wife to her dower of jointure, or preclude her from the recovery thereof, if otherwise entitled thereto.'' (Sec. 5828, Rev. Codes.)

In view of the above statutes it was idle to allege plaintiff's children sought conveyances to themselves of plaintiff's lands so that the defendant "would not receive any portion thereof'' and there is nothing in the evidence that sustains such allegations. The only person to whom plaintiff could convey his lands freed of the wife's inchoate dower interest *without the wife's assent* was to the wife herself. Such were the conveyances of April 1, 1939, of plaintiff's Montana lands. In the deed of the same date of the Minnesota lands naming plaintiff's children as grantees the defendant *assented,* signed and acknowledged said deed along with plaintiff and thereby was her dower interest "relinquished in legal form.'' (Sec. 5813, Rev. Codes.) Again it must be remembered that within six weeks after the marriage, Otto, under the skillful guidance of Mary, had conveyed *all* of his real estate so that after April 1, 1939, he had nothing to convey.

The cross-complaint complains in *general* terms of the conduct of plaintiff's children without naming any of them or specifying the act or acts of which each is accused. It is alleged that the children of the plaintiff objected to the marriage; that they treated defendant with disrespect and contempt; and "that during all of said time that the plaintiff acquiesced in the conduct of said

children and permitted them to continue said conduct." The evidence is undisputed that at the time of the marriage plaintiff's daughter, Mrs. Leona Lensman, had attained her majority and was married and that plaintiff's five sons had all attained their majority, were grown men and all but one of them married.

At the time of the trial plaintiff's daughter was residing with her husband, William Lensman, in the state of Oregon; plaintiff's son Lawrence was in Minnesota where he had continuously resided for 15 years; plaintiff's son Raymond was in the United States Army stationed at Camp Roberts, California; plaintiff's son Ervin had suffered an accident which affected him mentally and he was then residing and being cared for in the state of Oregon; plaintiff's son Selmer, who was then 37 years of age and had then been married nine years, resided with his wife and family in Lake county, Montana, and plaintiff's son Arthur with his wife and children resided on a farm which he owns, located about two and a half miles from plaintiff's Lake county farm.

Arthur Detert, a witness at the trial, testified that he had never complained about his father's marriage or his property; that he and his wife often visited at the home of plaintiff and defendant and that he had never been disrespectful to defendant. Ruth Detert, his wife, also testified to the friendly relations which had existed between the two families, which testimony corroborated that of her husband.

Selmer Detert, a witness at the trial, testified he had never objected to his father's marriage; that he considered that his father's own business; that he had never criticised the marriage nor had he caused any trouble between the parties and that he had never even visited the home of plaintiff and defendant.

The evidence shows the plaintiff's son Raymond stood up with plaintiff and defendant when they were married; that he and his brother Ervin and the latter's wife were residing on plaintiff's Lake county farm at the time of the wedding and that thereupon Ervin and his wife and Raymond all vacated the premises so that plaintiff and defendant could move in and that in August or September, 1939, Otto, Mary and Mary's three

children moved on the farm where they were voluntarily provided for and maintained by Otto. A few months after the marriage of Mary and Otto the latter's son Ervin was badly injured by a horse and while his wounds were healing, for a short time he was cared for in his father's home. Other than for this short period none of plaintiff's sons at any time resided with or at the home of Otto and Mary and none of them was under the authority or control of the plaintiff. The only one of the children that Mary accused of making threats against her was Ervin and this at a time when, because of his mental unbalance, he was not responsible for his acts or conduct nor was his father, under the law, answerable for the acts of his mentally afflicted son. The statute expressly provides that the authority of the parents ceases "* * * 2. *Upon the marriage of* a child; or, 3. *Upon it attaining majority."* (Sec. 5841, Rev. Codes.) The foregoing opinion of my associates terms this an "abstract proposition." There is nothing "abstract" about it at all. It is the statute, (sec. 5841, Rev. Codes), and it is the law of this case that denies to Mary the right to charge against and visit upon the father, Otto, the sins of his adult progeny.

What legal authority or control had this plaintiff over the state of mind or attitude of his mature and married daughter or of the grown men, who are his sons? If, as is alleged in the cross-complaint, these adults "constantly complained to *plaintiff and defendant* about said marriage," no doubt such complaints proved equally as vexing and annoying to plaintiff as to defendant but what could Otto do about them? Under the statute, section 5738, Revised Codes, the conduct which may constitute extreme cruelty as cause for divorce is not the conduct of third persons over whom neither party to the marriage has authority or control. The statute requires the conduct to be that of a "party to the marriage." The conduct contemplated is "the infliction of grievous mental suffering *upon the other by one party to the marriage,* by a course of conduct towards or treatment of *one party to the marriage by the other."* (Sec. 5738, Rev. Codes.) Under the statute, it is the conduct of the plaintiff

for which he is answerable and not the conduct of adult offspring who are not members of his household and over whom he long since had lost both actual and legal control.

The rule is stated in *Holt* v. *Holt*, 204 Mass. 25, 90 N. E. 392, where, in a suit by the wife for divorce based on cruelty, evidence of an assault made on her in the presence of the husband by his alleged paramour was held to be inadmissible against the husband "unless he is shown to have made the act his own, either by procurement, or prior assent, or by acquiescence or subsequent approval and adoption."

*Day* v. *Day*, 84 Iowa 221, 50 N. W. 979; *Thompson* v. *Thompson*, 205 Mich. 124, 171 N. W. 347, 3 A. L. R. 990 and *Hall* v. *Hall*, 9 Or. 452, are cited in the majority opinion as being cases similar to the instant case but an examination of these decisions will readily demonstrate their dissimilarity as well as inapplicability to fact situations such as obtain here.

In the *Day case,* supra, after the marriage the husband took the wife and her daughter by a former marriage to his home where he required them to live *under the same roof* with his adult children by a former marriage and where the family then consisted of seven to ten persons all residing in the same home. A daughter by this former marriage was by the husband permitted to take over and *rule* the household and to constantly abuse and humiliate the wife. The court held that when the husband's wife left the home, after standing for this conduct and treatment for almost five years, such departure did not constitute desertion.

In the *Thompson case,* supra, the court, with some hesitation, affirmed a decree of divorce granted to the wife for extreme cruelty where the husband insisted that she live *under the same roof* with and in the home of his mother who continually abused the wife, called her a prostitute, ordered her out and made her living there impossible and intolerable, the evidence showing that the husband stubbornly refused to provide a home for the wife apart from that of his mother.

In *Hall* v. *Hall*, supra, trouble arose over the conduct of the husband's three adult children by a former marriage for whose

support he was not legally or morally bound to make provision but whom he kept *under the same roof* with the wife and at the family domicile in utter disregard of her remonstrances and of his antenuptial promise to provide for them elsewhere. These adult children assaulted the step-mother; they habitually treated her with disrespect; they applied degrading epithets to her and their conduct was such as to justify a reasonable apprehension on her part of danger to her person from their violence while endeavoring to perform her household duties in her own home.

Each of the above is an "under the roof case" where the husband required or sought to compel the wife to live in the same home with adult relatives of the husband, who daily mistreated, abused and humiliated the wife, with full knowledge of the husband whose duty it was, as head of the family, to regulate his own household and to either remove from the home his objectionable relatives or establish another place of abode for his wife where she would not be required to be in intimate contact with them. The instant action is not an "under the roof case," for as before stated, plaintiff's children did not live with defendant nor at the family domicile nor under the same roof with defendant. Mary was not compelled to abide in the same home or to experience daily or intimate contact with plaintiff's children and she was free to rule and regulate her own household without interference from any of plaintiff's children.

The cross-complaint alleges that the "plaintiff from time to time mentioned to this defendant said complaints and hostility on the part of said children toward this defendant, and that during all of said time that said children were hostile and annoying the defendant and the plaintiff communicated said facts to this defendant." Nowhere does defendant aver nor does the evidence show that defendant ever indicated to plaintiff her displeasure at receiving this information or that she ever protested to plaintiff or in any way attempted to discourage him from mentioning these matters to her. From aught that appears in the record defendant may have ever turned an attentive ear to such reports and she may have been eager and willing to learn all about plain-

tiff, his family, his business, his joys, his sorrows, his ups, his downs and his worries. Even though it be conceded that plaintiff's communications to defendant developed to be unpleasant, still it must be remembered "mere unpleasantness in the home life does not establish a case of extreme cruelty." (*Gindorff* v. *Gindorff*, 295 Mich. 469, 295 N. W. 229, 230.) It is not extreme cruelty nor a cause for divorce for a husband to have "mentioned" or "communicated said facts to this defendant" as alleged. The statute, section 10536, Rev. Codes, expressly declares it to be the public policy of this state to encourage confidence between husband and wife and to preserve it inviolate. Thus does public policy seek "to preserve inviolate the peace, good order, and limitless confidence between the heads of the family circle so necessary to every well-ordered civilized society." (*Mercer* v. *State*, 40 Fla. 216, 24 So. 154, 157, 74 Am. St. Rep. 135; also see *Stocker* v. *Stocker*, 112 Neb. 565, 199 N. W. 849, 36 A. L. R. 1063.) As is correctly stated in *Goodrum* v. *State*, 60 Ga. 509: "So, too, of a man when alone with his wife. The twain are one flesh; and when they are secluded from all the world besides, their speech and their silence should be alike under the seal of confidence, and as free and unrestrained as the most inviolable confidence can inspire."

I have carefully analyzed the various allegations of the cross-complaint wherein the wife complains of alleged acts of the husband and of his children and it is clear that no cause of action is stated therein and that none of the acts charged against the husband are of the character required to constitute acts of extreme cruelty under our statute.

The defendant's defective pleading is not aided by the proof introduced for the evidence likewise fails to reveal any conduct on the part of the husband that amounts to extreme cruelty on his part or that entitles the wife to a decree of divorce. The defendant's testimony when on the witness stand it replete with admissions that the plaintiff was a good man and that he treated her kindly. She testified:

"Q. What was the relationship between you and Mr. Detert

from the date of your marriage until April 1st? A. We just got along swell. We didn't have any trouble at all. * * *

"Q. From then on what were your family relationships? Did they continue the same? A. They continued the same.

"Q. How did you and Otto get along for the next year? A. We always got along good. We never did have any trouble. * * *

"Q. What did you say to him in that conversation? A. I just told him 'Why don't we go away together and eliminate all this trouble.' That he and I never had any trouble and what was the matter now? He said, 'I don't know. I don't see how I am going to live without you, but I don't know what I am going to do.'"

Regarding a conversation she had with Mrs. Johanna Auwen about her marriage with Otto, defendant testified, "She asked us how we were getting along, and I told her just fine." Again she testified, "He and I got along swell, so far as he and I were concerned. I still say that. * * * I always told everyone I thought he was a good man. * * * I always thought he was, until lately." It cannot be unfair to defendant, a party to the action, to deal with her case from the standpoint of her own statements. (*Putnam* v. *Putnam*, 86 Mont. 135, 282 Pac. 855; *Morton* v. *Mooney,* 97 Mont. 1, 33 Pac. (2d) 262.)

I here repeat that the district court in the equity case in its finding No. II found that: "During the period they lived together they seemed to get along very well, and the most confidential relations existed between them, and the plaintiff did repose the greatest confidence and trust in the defendant, and advised with the defendant in all their business affairs, and believed the defendant would deal fairly and justly with him in all things." It is my view that the district court's decree in the equity suit establishes that the plaintiff was not guilty of extreme cruelty toward defendant "during the period they lived together" and that by such determination of the district court in the equity suit such court is concluded as are the parties to the suit and as is this court. The one and only justification that

346

the district court had for granting relief to plaintiff, for ordering the cancellation of defendant's deeds and for requiring her to reconvey the property to plaintiff was because the evidence showed and the court found that the defendant had been guilty of wrongful conduct and fraud of which the plaintiff was the innocent victim. It was the wife who betrayed the great confidence and trust that the husband had reposed in her for two years and four months. It was her *wrongful conduct* that put an end to the husband's confidence and trust in her; that destroyed the peace of mind and happiness of the husband and that rendered the continuance of the married relation forever unreasonable and intolerable to him. The district court's findings and decree in this case are contradictory of its former findings and decree in the equity suit between the same parties by which it was and is concluded here. The admissions made by defendant in her pleadings and in her testimony, coupled with the conclusive evidence introduced about which there can be no dispute, establishes that defendant was not entitled to a decree herein.

The right of the court to make an award of permanent alimony does not exist in the absence of express statutory authority and where, as here, the evidence conclusively establishes the only wrongful conduct amounting to extreme cruelty that is shown is that of the wife, she most certainly is not entitled to be awarded either decree or a lump sum of money as permanent alimony.

The law is as stated in *Grush* v. *Grush*, 90 Mont. 381, 3 Pac. (2d) 402, 403, where we said: ''But where the divorce is granted for an offense of the wife, the court is without authority to make an award to her of permanent alimony. [Citing cases.] An attempted award under such circumstances is without jurisdiction and void, subject to direct or collateral attack at any time and is unaffected by the consent of the parties.''

Marriage is something more than a mere ''share the wealth'' arrangement and the relation should not be considered as a license to loot the estate or fraudulently acquire the property of either spouse.

Where, as here, the wife, by her wrongful conduct, has entirely

defeated the proper and legitimate objects of the marriage and put it on the rocks, she is entitled to neither decree nor award of alimony. For these reasons the decree should be reversed.